HENRY MASON, LOUIS Q. JONES and Others, Appellants, *v.* GEORGE G. WILLIAMS and JACOB K. LOCKMAN, Executors of the Last Will and Testament of LOUIS C. HAMERSLEY, Deceased, LILY W. HAMERSLEY, Individu- ally and as Executrix, etc., and Others, Respondents.

*Probate of will — undue influence — presumption as to its intelligent execution — effect of the declarations of the testator after the date of the will.*

Upon an appeal from a decree of the Surrogate's Court admitting to probate the last will of Louis C. Hamersley, deceased, it appeared that the will was dated and executed on February 10, 1883, and that the testator died on May 3, 1883, leaving a wife, Lily W. Hamersley, but no children, and no father or mother. His father died in January preceding his own death. The only next of kin of the testator on his father's side was his uncle, John W. Hamersley. Upon his mother's side he had a number of next of kin, brothers and sisters of his mother, and their descendants. He was married in 1879, and was before that time and afterwards a gentleman of large fortune, although the bulk of his estate at the time of his death had been derived from his father.

By the will the testator substantially gave the whole income of his property to his wife for life, and after her death he willed all of it to his own issue, if any; in default of such issue to the male issue of his cousin J. Hooker Hamersley, and in default of such issue to such charitable societies in New York as his wife, by her will or other instrument in writing, might appoint.

The probate of the will was contested upon the ground that it was radically dif- ferent from a holographic will written by the testator six weeks earlier, but which he was prevented from executing ; that he was a man of weak mind and that the alleged will was not duly executed; that his mind did not accompany

the act of execution; that he had no conscious knowledge of the alleged will, and that the will was obtained by undue influence practiced upon him by his wife and others acting in her interest.

The court at General Term being of opinion that this claim was wholly unsupported by the evidence:

*Held,* that undue influence must be proved precisely as any other fact; that a wife or parent had a right to exert influence, had a right to advise, had a right to urge and had a right to suggest; and that unless the argument or suggestion is of so potent a character that it overcomes the will of the testator, it in no manner impaired the validity of the act of the testator, even if done in accordance with the argument or suggestion.

That there was no presumption to be indulged in, against an intelligent execution of a will, where the testator has had ample time and opportunity to acquaint himself with the contents of the instrument executed.

Testimony was offered by the contestants to show that the testator had made declarations after the date of the will, to the effect that his wife had made efforts to influence and obtain from him a will in her favor. Questions were asked of a witness as to whether he had had any conversation with the testator about another will; about an effort being made to induce him to make a certain will by any person, and whether the testator ever said anything to him about efforts being made by his wife to obtain from him a will, and as to whether he said anything to him upon the subject of whether or not his wife had asked him to make a will in her favor? The surrogate sustained objections to the questions on the ground that they did not call for a declaration of testamentary purpose, and that undue influence could not be proved by the decedent himself.

*Held,* that, as there was no evidence that the declarations were made so soon after the execution of the will as to afford a reasonable inference that he was not then competent to make his will, the evidence was properly rejected. (MACOMBER, J., dissenting.)

*In the Matter of Clark* (40 Hun, 237) distinguished.

APPEAL from a decree of the Surrogate's Court of the county of New York admitting to probate the last will and testament of Louis C. Hamersley, deceased, which was entered in the office of the clerk of said Surrogate's Court on the 3d day of June, 1886.

This case was argued at the November Term, 1887; reargument ordered at the June Term, 1888, and reargued at the November Term, 1888.

*Elihu Root* and *Franklin Bartlett,* for the appellant.

*James C. Carter* and *George De Witt, Jr.,* for the respondents.

*Robert Sewell,* for the respondent, Lily W. Hamersley.

VAN BRUNT, P. J.:

The will in question was dated and executed on the 10th of February, 1883; the testator died on the 3d of May, 1883, leaving a wife, Lily W. Hamersley, but no children, and no father or mother. His father died in the January preceding his own death. The only next of kin of the testator on his father's side was his uncle, John W. Hamersley, a brother of the testator's father. Upon his mother's side the testator had a number of next of kin, brothers and sisters of his mother and their descendants. The testator was the only child of Andrew Gordon Hamersley. He was married in 1879, and was before that time and afterwards a gentleman of large fortune, although the bulk of his estate, at the time of his death, had been recently derived from his father. By the will the testator substantially gave the whole income of his property to his wife for life, and after her death he willed all of it to his own issue, if any, and in default of such issue to the male issue of his cousin, J. Hooker Hamersley; and in default of such issue to such charitable societies of New York as his wife, by her will or other instrument in writing, might designate and appoint.

The probate of this will was contested upon the grounds that it was radically different from a holographic will written by the testator six weeks earlier, but which he was prevented from executing; that Louis C. Hamersley was a man of weak mind, and that the alleged will was not duly executed; that the mind of Louis C. Hamersley did not accompany the act of execution, and that he had no conscious knowledge of the alleged will; and that the will was obtained by undue influence practiced upon him by his wife and others acting in her interest.

An examination of the record shows that the most material part of the testimony upon which the case of the contestants depends was taken in absolute defiance of the prohibition of sections 834 and 835 of the Code. Lawyers and physicians of the testator were examined and testified from knowledge procured at professional visits made by them upon the testator and by the testator to them. This evidence seems to have been admitted upon the theory that the prohibition of sections 834 and 835 did not apply to the testamentary cases. It is difficult to see, upon a reading of the sections in question, how any such idea came to be entertained, because its

language is positive and unequivocal, and makes no exceptions as to the class of cases to which they shall apply; and they must necessarily apply to testamentary cases as well as to any others, unless the plain provisions of the sections are to be repealed by judicial legislation. They require no construction, but are plain and explicit, and they condemn the admission of this testimony, and such evidence cannot be considered by this court in the determination of this appeal. The evidence shows, by a preponderance of testimony, that the testator was not of that weak mind which is claimed by the contestants. It would appear from such evidence that he was a man of certainly ordinary capacity and a rather stubborn will. Neither is the claim that the alleged will was not duly executed and that the mind of the testator did not accompany the act of execution, and that he had no conscious knowledge of the will, sustained by evidence. The due execution of the will was proved, if we leave out of the case the testimony of Lockman as to what transpired between the testator and himself. We have, then, the case of a testator having in his possession a will drawn by his solicitor, signed by him in the presence of the witnesses ,and stating that it was satisfactory to him as his will, and acknowledging and declaring the instrument, in response to a question put to him, to be his last will and testament, and requesting the witnesses to sign it. This evidence shows a perfect execution of the will, and there is no presumption whatever to be drawn from the circumstances, that the testator was unacquainted with the contents of the instrument which he signed after having declared himself satisfied with it. If we take into consideration the testimony of Lockman, which probably we have no right to do, then it is clear that the testator gave the instructions to draw the will in the manner in which it was drawn, and there is every reason to believe that before execution he read it, and acquainted himself with its contents. There is no presumption to be indulged in against an intelligent execution where the testator has ample time and ample opportunity to acquaint himself with the contents of the instrument executed.

The objection that the will is radically different from the holographic will written by the testator six weeks earlier, which he was prevented from executing, and that, therefore, the alleged will was

obtained by undue influence practised upon the testator by his wife, is wholly unsupported by the evidence. The position of the contestants seems to be that because the wife had an opportunity to exert undue influence and had a motive to exercise such influence, and because provision is made for her beyond what the law provides for her, she has exercised such undue influence. It seems to us that no such presumption can arise, and that undue influence must be proved precisely as any other fact, and cannot be presumed. Upon the contrary, where there are two inferences which may equally well be drawn from the testimony upon the question of undue influence, we are bound to accept that which is consistent with honesty and fair dealing and reject that which establishes a fraud. A wife or a parent has a right to exert influence, has a right to advise, has a right to urge and has a right to suggest, and unless the argument or suggestion is of so potent a character that it overcomes the will of the testator, it in no manner impairs the validity of the act, even if done in accordance with the advice or suggestion. Influence is not necessarily undue, and it must be undue influence which is established by the evidence before a will can be impeached upon that ground.

Where is the evidence of the exercise of any influence whatever upon the wife of the testator in respect to the execution of this will? It is alleged that the evidence of this influence is to be found in the fact that the will as executed is radically different from the holographic will written by the testator six weeks earlier. But let us consider a moment the circumstances under which that will was prepared. This testator's father was then alive. It is apparent that in the preparation of that will the father exerted a strong influence upon the son, because we find a draft for the son prepared in the father's handwriting. Is it not rather to be presumed that this unexecuted holographic will was prepared because of the undue influence of the father upon the son, which influence, however, the son so far resisted that he did not execute the will, than to be presumed that the execution of the will in question was due to the undue influence of his wife? In view of the relations existing between the father and the son, and in view of these documents having been prepared by the father in the first instance, there is just as much evidence, and probably more, tending to establish the inference that undue influence was exercised by the father to induce the son to make

the will about which he was negotiating with Mr. Strong rather than that the wife was guilty of undue influence in causing the will actually executed to be prepared. We can find no presumption in favor of undue influence to bring about the execution of the will which cannot be applied with tenfold force to the preparation of the proposed unexecuted will. It is not the province of the court to set aside wills merely because they fancy there may have been some undue influence exercised. In order that the decree of the surrogate may be overthrown in a case of this description there must be grave doubts as to whether the will in question was the will of the testator, not that there may be some doubt upon the question; and those doubts cannot rest upon fancy, but must be based upon fact. We think, therefore, that there is nothing upon which the claim but that this will was the will of the testator, duly executed without duress or restraint, can rest.

Some exceptions have been taken to the admission of evidence, and to one of these only it is necessary to call attention, as Mr. Justice MACOMBER seems to think that error was thereby committed. He says: "Testimony was sought to be given by the appellants that the testator had made declarations after the date of the will to the effect that his wife had made efforts to influence and obtain from him a will in her favor. This effort appears in different parts of the case, but more conspicuously when the witness Cortlandt De Peyster Field was on the stand.

The following questions were asked of this witness:

"Did you ever have any conversation with Louis Hamers.ey about another will, about an effort being made to induce him to make a certain will by any person?" (Objected to. Objection sustained.)

"Did Louis Hamersley ever say anything to you about efforts being made by his wife to obtain from him a will?" (Objected to as hearsay.)

The SURROGATE — It is not a declaration of testamentary purpose, and I do not think you can prove undue influence by the decedent himself.

"Did he say anything to you upon the subject of whether or not his wife had asked him to make a will in her favor?" (Objected to. Objection sustained. Exception.)

This ruling, the learned judge states, does not seem to be in accord with the decisions of this court. In the *Matter of Clark* (40 Hun, 237) the court say: The proponents also took exception to the admissions of declarations made by the the testator in the November following the time of the making of the will. Those declarations had relation to the terms of the will he had made and the one he first undertook to make, and in respect to this added his wife objected to it and he had to make another. The evidence was clearly incompetent to prove the contents of the will in question, or those of that he had first purposed to make, or to show that the one made was caused or produced by duress. The validity of the will cannot be affected or impeached by his declarations. They were no part of the *res gestæ* and, therefore, were not any or competent evidence of the facts stated by them. But the question on the trial was whether the will was the result of undue influence which involved the consideration of the mental condition of the testator at the time he made it. Although he was then of sound disposing mind and memory, his susceptibility to the influence and control of others depended somewhat upon the vigor and character of his mind and will power. He was in feeble health at and from the time the will was made until his death; notwithstanding he improved in that respect and was out some in the meantime, his declarations were only competent as bearing upon the state and condition at the time of the testamentary act. The declarations were made about two months afterwards, and were not separated from the act by such length of time nor were there such intermediate changes of condition as to enable the court to hold, as matter of law, that it was not competent to prove them with a view to an inquiry as to his mental vigor and condition at the time the will was executed, as bearing upon the question of undue influence. And we are also referred to a decision in 99 Massachusetts (*Shailer* v. *Bumstead*, p. 112) to the same effect.

But applying this rule to the questions asked, it appears that they by no means complied with the requirements therein contained, because there is no time fixed as to when these declarations were made. There is no evidence that they were made so soon after the execution of the will as to afford a reasonable inference that such was then the condition of his mind. But it rather appears that they

were made before the execution of his will (whether during the life-time of his father we know not), and, therefore, it does not appear that there were not such intermediate changes of condition after the death of his father as would naturally destroy them as an argument for the purpose of upsetting the testamentary disposition of his property made subsequent to that event. But, upon a further examination of the case, it appears that, as far as these questions were relevant, the witness was not in possession of facts which tended in any way to show that any undue influence had been exercised by his wife, or any improper solicitations had been made upon her part in relation to the making of the will. The witness was asked immediately after the last ruling, " Have you told us all you know about the testamentary declarations?" and he answered, "I think I have told all I remember at the moment." " Q. Did he ever make any declaration to you as to his intention with reference to his wife? A. I dare say he has, but I don't remember anything specifically. Q.. You cannot state anything definite at the moment? A. I don't remember anything specific. Q. Can you state the substance of anything? A. I don't think I can. Q. Do you mean to say you don't remember? A. I don't remember; I have an indistinct recollection of a great many things which I cannot put into a sufficient form to answer the question." Here it appears that the witness had told all that he knew in regard to the testamentary declarations of the testator. And the mere fact that the witness was willing to swear to the circumstance that Louis C. Hamersley had told him that his wife had asked him to make a will in her favor cannot in any way impair the validity of the act which had been done and by which his wife might be said to profit.

Under the language of section 2545 of the Code of Civil Procedure, the General Term should not order a new trial unless it appears that the exceptant was necessarily prejudiced by an erroneous ruling. There is no evidence of any prejudice. Upon the contrary, the weight of the evidence is that the testimony, even if admitted, would have been of no particular consequence upon this issue of undue influence. But it is urged by the learned justice that because of the testimony of Strong, showing the earlier testamentary disposition in the negotiations or interviews with him in regard to the unexecuted will, this evidence becomes important. As already

stated, the court had no right to consider the evidence of Strong. It was given in violation of the rules of section 835 of the Code. For this reason, therefore, it affords no support whatever to the claim that the evidence of Cortlandt De Peyster Field may have been important. But conceding that Strong's evidence is to be considered, how does that evidence establish anything else than that the father was endeavoring to get the son to make a will? Or even if that be not so, then the change in the testator's condition, by reason of the death of the father, was a sufficient reason for the change of testamentary intention.

Without proceeding further in the discussion of the evidence in this case, which is too voluminous to be gone into at length, it is sufficient, to sum up the whole matter, to say that there is no evidence whatever of undue influence exercised upon the part of Mrs. Hamersley to obtain the making of the will in question by the testator; and the necessary conclusion is that the will was duly executed, the testator having full knowledge of its contents, he having had ample opportunity to acquaint himself therewith, and apparently having done so.

The decree of the surrogate should be affirmed with costs.

BRADY, J., concurred.

MACOMBER, J. (dissenting):

The will was dated and executed on the 10th day of February, 1883. The testator died on the third day of May of that year, aged forty-three years, leaving a wife, Lily W. Hamersley, now the Duchess of Marlborough, but no children or other descendants, and no father or mother. His father died but a few weeks before his own death. The only next of kin of the testator on his father's side was his uncle, John W. Hamersley, a brother of the testator's father. Upon his mother's side the testator had a number of next of kin, brothers and sisters of his mother or their descendants; some, but not all, of these contest the probate of the will. The testator was the only child of Andrew Gordon Hamersley. He was married in November, 1879, and was, before that time and afterwards, a gentleman of leisure and of large fortune, though the bulk of his estate at the time of his death had been but recently derived from his father. By the will the testator substantially gave the

whole income of his property to his wife for life.   After her death he willed all of it to his own issue, if any, and in default of such issue, to the male issue of his cousin, J. Hooker Hamersley, a bachelor, and in default of such issue, to such charitable societies of New York as his wife, by her will or other instrument in writing, might designate and appoint.

Testimony was sought to be given by the appellants, that the testator had made declarations after the date of the will, to the effect that his wife had made efforts to influence and obtain from him a will in her favor.   This effort appears in different parts of the case, but more conspicuously when the witness Cortlandt De Peyster Field was on the stand.

The following questions were asked of this witness: Q. Did you ever have any conversation with Louis Hamersley about another will; about an effort being made to induce him to make a certain will by any person?   (Objected to.   Objection sustained.)   Q. Did Louis Hamersley ever say anything to you about efforts being made by his wife to obtain from him a will?   (Objected to as hearsay.) The Surrogate— It is not a declaration of testamentary purpose, and I do not think you can prove undue influence by the decedent himself.   (Exception.)   Q. Did he say anything to you upon the subject of whether or not his wife had asked him to make a will in her favor?   (Objected to.   Objection sustained.   Exception.)

The ruling of the surrogate does not seem to be in accord with the decisions of this court.   *In the Matter of Clark* (40 Hun, 237), the court say : " The proponents also took exception to the admission of declarations made by the testator in the November following the time of the making of the will.   Those declarations had relation to the terms of the will he had made and the one he first undertook to make, and in respect to this added, ' his wife objected to this and he had to make another.'   This evidence was clearly incompetent to prove the contents of the will in question, or those of that he had first purposed to make, or to show that the one made was caused or produced by duress.   The validity of the will cannot be affected or impeached by his declarations.   They were no part of the *res gestœ*, and, therefore, were not any or competent evidence of the facts stated by them.   But the question on the trial was whether the will was the result of undue influence, which involved

the consideration of the mental condition of the testator at the time he made it. Although he was then of sound disposing mind and memory, his susceptibility to the influence and control of others depended somewhat upon the vigor and character of his mind and will power. He was in feeble health at and from the time the will was made until his death, notwithstanding he improved· in that respect and was out some in the meantime; his declarations were only competent as bearing upon the state and condition of his mind at the time of the testamentary act. The declarations were made about two months afterwards, and were not separated from the act by such length of time, nor were there such intermediate changes of condition as to enable the court to hold, as matter of law, that it was not competent to prove them with a view to an inquiry as to his mental vigor and condition at the time the will was executed, as bearing upon the question of undue influence."

So, also, in the case of *Shailer* v. *Bumstead* (99 Mass., 112), it was held that on the trial of issues, whether the· execution of the will was procured by fraud or undue influence, and whether the will was executed by the testatrix in ignorance of its contents, evidence of the subsequent acts and declarations was admissible to prove the subsequent existence of the condition of her mind, if they occurred so soon after the execution of the will as to afford a reasonable inference that such was then the condition of her mind, though such evidence was held inadmissible to prove the actual fact of fraud or of undue influence in the matter.

The exceptions to the rulings of the surrogate would, under these authorities, lead necessarily to a new trial to be had before a jury, if, under the language of section 2545 of the Code of Civil Procedure, "it appears to the appellate court that the exceptant was necessarily prejudiced thereby;" otherwise not.

The important question, therefore, is, were the appellants prejudiced by the rulings of the surrogate which excluded evidence of the declarations of the testator relating not to the existence of the fact of undue influence or of fraud, but rather to the condition of his mind, as a necessary element in the consideration of the question, whether the acts done by the wife and her friends were calculated to operate unduly and improperly upon the will of the testator?

The main contention by the appellants is that the alleged will was

obtained by undue influence practiced upon the testator by his wife and others acting in her interest; that, though, in a technical sense, the deceased had testamentary capacity, yet he was of such a weak mind as to be easily operated upon by an influence against his own desires.

Perhaps the most important fact, and the one which pervades the whole case, is that six weeks before the making of this will the testator endeavored to make another will, and wrote out, in his own hand, a full expression of his testamentary desires, wholly inconsistent with the terms of the will in question, and instructed counsel to draft a will in accordance therewith.

The testimony of Charles E. Strong, the attorney to whom the testator went for such purpose, is very full and instructive, and without it a clear perception of the case cannot, in my judgment, be had. Starting, therefore, at the fact that the deceased had, as is shown, an entirely different testamentary purpose in his mind as to the disposition of his property six weeks before the making of this will, it is of vital importance to inquire why there occurred a change of purpose in the making of another will which has no resemblance whatever to the one that was prepared substantially by his own hand. The will was brought to Mr. Hamersley's house on the evening of its execution, February 10, 1883, by Jacob K. Lockman, who had it already prepared for signature. The only persons present, besides the testator, were his wife, Mr. Lockman and two of Mr. Lockman's clerks, Bishop and Silvester.

At the same time the deceased executed his promissory note in the sum of $10,500, by which he promised to pay G. G. Williams, president, that sum of money, and also gave to Williams and to Lockman a power of attorney. Hamersley never spoke or wrote to Lockman afterwards in regard to the will. Not only was the testator's legal adviser ignored in this matter, but the customary family physician had been discarded. Was this sudden and almost unaccountable change of testamentary desires brought about naturally and as a voluntary act of the deceased, or was it done by the overlaying upon him of a stronger will than his own, smothering his real intentions? Was the exercise of such illegal influence made possible by the fact that the testator had become seriously weakened

in body by long and painful maladies which had materially impaired the resisting power of his will? These are vital questions in this case, and the tribunal passing upon them should have the benefit of all the testimony which the rules of evidence afford. On the 19th day of December, 1882, the testator was attacked with acute bronchitis at Troy, which attack lasted five days. It is shown that he never fully recovered from that ailment until after he went south, in the month of February, 1883. His father died of pneumonia the 24th day of January, 1883, at the residence occupied by the son, after an illness of ten or twelve days. At that time the testator was himself ill with pleuro-pneumonia in another room in the house, and was not able to attend his father's funeral. The death of his father had made a deep impression upon the mind of the son. They were shown to have been unusually intimate and regardful of each other. In the month of February the testator went south, accompanied by a nurse, as well as by his wife. On his return in April, he was taken ill in Washington, D. C., and finally took to his bed April 27, 1883, from which he never arose. It appears to have been the purpose of the testator, as late as at the time of his going to the south, to give a considerable portion of his property to charity, and to that end he had consulted his confidential physician, Dr. Gillette. Indeed, he seems to have wholly ignored the will in question, if he ever had conscious knowledge of it, because it does not appear that he ever referred to the will after it was carried away by the attorney. The evidence shows the will was not read over to the deceased, but that after it was prepared he took it in his hand and looked at it for three or four minutes. Whether he thereby familiarized himself with its terms so that he clearly understood the disposition which he was making of his vast estate is a fair subject of contention.

After giving his wife the income of the whole estate during her life, he devises and bequeaths the property to the male issue of his cousin, J. Hooker Hamersley, who was then living, without issue and unmarried, but in the event that the cousin should die without male issue surviving him or surviving the testator's wife, then he gives, devises and bequeaths " the whole of my said estate, real and personal, to such charitable and benevolent corporations located in the State of New York, and incorporated by virtue of the laws thereof,

and in such shares and proportions as my dear wife shall by her last will and testament, or instrument in writing, for that purpose made and executed and acknowledged by her, direct, designate and appoint for that purpose; and I hereby fully authorize and empower my dear wife to make such last will and testament or instrument in writing, and the direction, designation and appointment as aforesaid." Unless the testator had been advised that by such provision of his will, in the event of the failure of male issue of J. Hooker Hamersley, his wife took absolutely all the property, with the right to dispose of it as she saw fit, of which there seems to be no proof whatever, then the counsel for the appellants may be excused for characterizing the will as containing "juggling provisions" which were not clearly apprehended by the testator. A significant fact is shown, that the testator requested Mr. Strong, when he should have prepared his will, in the month of December, 1882, under the testator's holographic instructions, to apprise him by letter, not that such will was ready for execution, but that he, the lawyer, desired to see him, the testator, upon some real estate matters.

Such are some of the salient facts in the case, which made it of vital importance, upon the trial, to ascertain, as far as human testimony and observation could do so, not only the testamentary intentions of the deceased, but also the condition of his mind, so that it could be satisfactorily determined whether the violent change in his testamentary purposes was due to his own voluntary act, or whether it was the result of undue influence or advantage, which the persons who immediately surrounded him availed themselves of. If this be correct, then it was not only technical error to exclude the testimony already adverted to, but the appellants were necessarily prejudiced thereby. But it is claimed by the learned counsel for the respondents, that though such evidence is competent to show the state of mind of the testator, yet it is inadmissible until the fact of the exercise of undue influence or fraud has been established by other evidence. I do not understand such to be the rule. If fraud and undue influence may be shown by circumstances, as has been attempted to be done in this case, and such circumstances do not appear to be frivolous upon the subject of the exercise of undue influence, then the declarations of the testator, designed only to show the condition or state of his mind, may be admissible. But the

attending facts, some of which are adverted to above, are not frivolous. On the contrary, while, as it is usual in such cases, they do not point conclusively to the exercise of undue influence or the perpetration of fraud upon the testator, a deduction of undue influence may or may not be made from them according to the weight and importance which may be given them.

It is further argued by the same counsel that there appears to have been no motive on the part of the wife to have this will executed, as she would probably get more property in case of the intestacy of her husband than she is likely to receive under the provisions of this will. What was pressing upon the parties at that time was not the question of a will or no will, but rather should it be this particular will instead of the testator's holographic instructions to his counsel. It may be needful again to recur to the terms of this probated paper. By it the wife has a life enjoyment of the whole of the income of the estate in any event. Then, after her death, there is a bequest of the remainder over to the children of the testator if there should be any. Yet, as was clearly enough known at that time, the birth of a child to them was regarded as a physical impossibility by every person, except, possibly, the enfeebled testator. It being a common and natural provision in most cases, it was, in this particular instance, well calculated to disarm a mind already weakened by acute physical disease. The proponent's witnesses say that the sick man took the paper and looked at it for three or four minutes. No one knows whether he read it or not. It certainly was not read to him. Did he try to grasp the hope that was held out to him, springing from a natural desire for lineal survivorship? But every one, except himself, knew the suggestion to be illusory. As if, however, the parties distrusted the potency of this suggestion, still plying him with the purpose to keep the estate in the family, the will declares that, in the absence of lineal descendants of the testator, the remainder of the estate, after the life of the wife, should go to the male issue of J. Hooker Hamersley, a cousin and a bachelor, who at that time had no prospects of marriage. As in the provisions for the testator's descendants there was an apparent physical impossibility of realization, so in the bequest of the remainder to the male children of J. Hooker Hamersley there was a moral improbability of fulfillment, yet it was doubtless suf-

ficient to awaken in the testator the hope of keeping the property in the Hamersley family name, however delusive such hopes seemed to all others.

The final disposition of the testator's property, however (direct and indirect family inheritance failing), was still more extraordinary and illusory. With no children of his own or male issue of his bachelor cousin succeeding, the estate was given to such charities existing in the State of New York, under corporate organization, as his wife should select. Was the perpetration of this provision of the will upon an enfeebled man, on the face of it, an imposition and a fraud? The testator doubtless thought, if he thought at all, that this clause secured his estate to charity in the event of failure of issue of himself and of male issue of his cousin. The thought was delusive, and this ultimate bequest was evidently thrust upon him in view of the established fact that his deliberate purpose had been, and was, to devote his property mainly to charitable and benevolent purposes. There is no provision requiring his wife to designate the charities. She took the whole of the estate, and whether any charity should be benefited thereafter was a matter resting entirely with herself. In plain view, therefore, of this deceptive clause of the will, the contention that the wife had no motive in procuring its provisions seems untenable. With the impossibility of direct issue, with the improbability of male issue of the bachelor cousin, with the legal certainty that no charity could claim the estate, the wife by this will held all of the possessions of her husband in her hand. Whether or not this scheme was one which was thrust upon the testator without conscious appreciation by him of its effect, or was intentionally and knowingly adopted by him in place of his prior established intentions manifested by consistent acts, is a question which, under all the circumstances, ought to be settled by the verdict of a jury.

The decree of the surrogate should be reversed, with costs to the appellants to abide the event, and a trial of the case had in a court with a jury, as the statute provides.

Decree of surrogate affirmed, with costs.